UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 11-50128 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **REPORT AND RECOMMENDATION** |
| JAMES LADEAUX, | ) ) | |
| Defendant. | ) ) ) | |

## INTRODUCTION

This matter is before the court on an indictment charging defendant James LaDeaux with assault of a federal officer, in violation of 18 U.S.C. § 111. Mr. LaDeaux has moved to suppress all evidence gained during the warrantless entry into his home by police on September 5, 2011.  See Docket No. 19.  The government resists the motion.  The district court, the Honorable Jeffrey L. Viken, referred this matter to this magistrate judge for an evidentiary hearing and a recommended disposition pursuant to the court's standing order and 28 U.S.C. § 636(b)(1)(B).

## FACTS

An evidentiary hearing in connection with Mr. LaDeaux's motion was held on Wednesday, March 14, 2012, at 9:00 a.m.  Present at the hearing were Mr. LaDeaux and his attorney, Assistant Federal Public Defender Gary

Colbath, Jr.  Assistant United States Attorney Heather Thompson was present on behalf of the government.  Two witnesses testified at the hearing, James M. Hooper, Special Agent with the Bureau of Indian Affairs, and Clayton Ten Fingers, patrol officer with the Oglala Sioux Tribe ("OST") Department of Public Safety.  Four exhibits were introduced:  an audio recording of 911 calls made to OST dispatch on September 5, 2011; two logs of transcriptions of 911 calls made to OST dispatch on the same date; and a video automatically created when the taser of OST officer Terry Demasters was deployed.  The following are this court's findings of fact drawn from this evidence.

At approximately 2:20 a.m. on September 5, 2011, a 911 call was made to the OST Public Safety dispatch.  The call was made from a third party, a neighbor of Mr. LaDeaux's, reporting that Mr. LaDeaux was chasing his girlfriend outside in the neighborhood.  The caller reported that the girlfriend was asking Mr. LaDeaux to leave her alone, but that Mr. LaDeaux was yelling at the girlfriend that she had cheated on him.  The caller reported that Mr. LaDeaux and his girlfriend appeared to be drunk.

The call was relayed by dispatch to Officer Clayton Ten Fingers, a police officer with the OST Department of Public Safety who was on duty and assigned to the area of Pine Ridge village.  Officer Ten Fingers drove to the LaDeaux residence, arriving at approximately 2:29 a.m.  Officer Ten Fingers was familiar with both Mr. LaDeaux and his wife, Amy Belt, as well as being

familiar with which trailer belonged to Mr. LaDeaux. Mr. LaDeaux lived in an area local residents refer to as the "old IHS [Indian Health Services] trailer court." This trailer court is located north of the Pine Ridge village police department and north of a small creek running through the area. Mr. LaDeaux's trailer was pink and white and the lengthwise axis of the trailer ran north and south. The trailer was on a corner lot and had a door facing east with a parking area adjacent to the east door.

Officer Ten Fingers knew Mr. Ladeaux and Ms. Belt from seeing them around town and at the tribe's casino. He also knew them from receiving on at least one prior occasion a report from Amy that she was the victim of domestic abuse at the hands of Mr. LaDeaux. However, on that prior occasion, which occurred approximately several months before September, 2011, Amy had refused to press charges against Mr. LaDeaux.

After receiving the dispatch call around 2:20 a.m. on September 5, 2011, Officer Ten Fingers drove to the LaDeaux residence. He knocked several times on the east door to Mr. LaDeaux's residence, announcing that he was the police and asking if anyone needed help. Officer Ten Fingers got no response. Officer Ten Fingers heard no noises from inside the residence either, so he left. Officer Ten Fingers testified that his training and experience have indicated that domestic violence situations often involve hostage-taking. When he did not get

a response from the LaDeaux trailer on this first contact, he testified that his concern over the situation increased.

One-half hour later, at 3:06 a.m., another series of 911 calls were placed to dispatch. On eleven of these calls, all that is heard is the sound of a woman crying and then the call is terminated. On one of the calls, the woman did not speak directly to dispatch, but left the phone off the hook so that dispatch could hear what was going on in the room. Dispatch heard a female crying and screaming, "Stay away from me," and "Get away from me." Dispatch also heard a male saying, "Give me that phone."

When calls are made to OST dispatch, there is a "CAD" system that tracks the geographic location of the call and assigns coordinates. From this, law enforcement has a general idea of where the call is coming from. The woman's unidentified calls to dispatch after 3 a.m. on September 5, 2011, were given coordinates showing that the call came from an area north of the police department and north of the creek. This was an area consistent with the old IHS trailer court, but the coordinates did not narrow the location of the 911 caller to a specific trailer.

Officer Terry Demasters was contacted by dispatch regarding this second call. He drove to the area of the old IHS trailer court and began looking for victims in the area of the creek.

Officer Ten Fingers was on a computer at the OST police station at the time these post-3 a.m. calls came in. He could see on the computer all the information that was coming in to OST dispatch as well as the coordinates assigned to the call by the CAD system. Acting on this information, Officer Ten Fingers drove in his patrol vehicle to the area of the LaDeaux trailer, arriving at approximately 3:14 a.m. He did not have his siren or flashing red lights activated. He parked next to LaDeaux's trailer again and turned off his headlights. He did not announce his presence.

Officer Ten Fingers saw Officer Demasters in the area a short distance away. He stepped out of his patrol vehicle and made a 911 call to dispatch in order that dispatch could compare the coordinates of his call to the coordinates of the call made shortly after 3 a.m. by the unidentified woman. Before dispatch could respond and tell Officer Ten Fingers how the coordinates of his call compared to the coordinates of the unidentified woman's call, a woman Officer Ten Fingers recognized to be Amy Belt came "busting out" of the LaDeaux house screaming, crying, and running past his patrol vehicle. At the same time, Officer Ten Fingers observed and heard someone slam the front door to the LaDeaux residence shut. Officer Ten Fingers did not see who had slammed the door shut.

Officer Ten Fingers testified that he was immediately concerned for his own safety as well as that of Amy's safety and the safety of any potential victim

that might still be inside the residence.  Officer Ten Fingers testified that he has had experience with domestic violence situations and has received training in how to handle such situations.  He testified that domestic violence can be volatile, and that violence may erupt from the primary aggressor, from family bystanders, and from the victim.  He further testified that when the primary aggressor loses control of his victim, this often results in an escalation of the violence.

  When Officer Ten Fingers saw Amy leave the LaDeaux residence crying and screaming, he thought that she had been the victim of domestic abuse.  His assumption was based on the earlier incident months before where Amy herself had reported to him that she had been the victim of domestic abuse at Mr. LaDeaux's hands.  It was also based on the earlier call to dispatch that same night by Mr. LaDeaux's neighbor reporting that Mr. LaDeaux was angry with Amy and was hollering at her and chasing her around the neighborhood, accusing her of infidelity.  It was also based on Amy's appearance as she fled, the overall impression being that she was scared.

  Officer Ten Fingers testified that when the unknown person slammed the door shut on the LaDeaux residence after Amy fled, he immediately feared that that person was going inside to retrieve a weapon and that such action would place himself and Amy in danger.  This thought was consistent with Officer Ten Fingers' training and experience that when an aggressor in a domestic violence

situation loses control of his victim, the violence often escalates.  He also feared that there might be another victim inside the house.  Wanting to intercept the perpetrator of the violence before he could obtain a weapon, Officer Ten Fingers immediately went to the east door to the LaDeaux residence and kicked the door in without knocking or otherwise seeking permission to enter.  Officer Ten Fingers had a flashlight in his left hand and his gun drawn and ready to fire in his right hand.

 Upon entering the house, he encountered Mr. LaDeaux.  Officer Ten Fingers shouted at him to show him his hands several times.  When LaDeaux turned toward Officer Ten Fingers, the officer could see that Mr. LaDeaux had a knife in his right hand.  Officer Ten Fingers described Mr. LaDeaux as in a fighting stance:  he was crouched, his left arm was extended out toward Officer Ten Fingers and his right arm was cocked, ready to strike with the knife.  Officer Ten Fingers demanded that Mr. LaDeaux drop the knife several times.  Mr. LaDeaux shouted to Officer Ten Fingers, "Shoot me, shoot me!"

 Officer Ten Fingers had only entered the home a distance of approximately four or five steps.  At this time, he began backing toward the door through which he had just entered.  Just outside the door, he encountered Officer Demasters, who had a taser gun.  Officer Ten Fingers told Officer Demasters to deploy the taser.  Officer Demasters did so, automatically triggering a video recorder attached to the taser gun.  The taser video depicts

Mr. LaDeaux in the stance described by Officer Ten Fingers, advancing on the officers immediately prior to the deployment of the taser.

Mr. LaDeaux argues that Officer Ten Fingers' entry into his home without a search warrant violated his Fourth Amendment right to be free from unreasonable searches and seizures. He asks that all evidence from within his home be suppressed. The government acknowledges that Officer Ten Fingers acted without a warrant, but argues that the exigent circumstances exception to the warrant requirement makes the entry constitutional. The court extends its thanks to both parties for helpful and articulate briefs that accurately set forth the law.

## DISCUSSION

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Maryland v. Buie, 494 U.S. 325, 331 (1990). In determining the reasonableness of a search, courts are to balance "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. A search of a home without a warrant supported by probable cause is usually unreasonable. Id. "[N]o zone of privacy is more clearly defined than a person's home: '[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.'" United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997) (quoting Payton v. New York, 445 U.S. 573, 590 (1980)).

There are, however, several exceptions to the warrant requirement "where the public interest is such that neither a warrant nor probable cause is required." Buie, 494 U.S. at 331. The burden is on the government to establish that an exception to the warrant requirement applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005); United States v. Weston, 443 F.3d 661, 668 (8th Cir. 2006).

"The [exigent circumstances] exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." Amburn, 412 F.3d at 915 (quoting United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996)). Whether this exception to the warrant requirement has been shown is evaluated objectively, on the basis of what a "reasonable, experienced officer would believe." Id. (quoting United States v. Kuenstler, 325 F.3d 1015, 1021 (8th Cir. 2003)). An officer's subjective motivations are irrelevant. United States v. Valencia, 499 F.3d 813, 815 (8th Cir. 2007) (citing Brigham City v. Stuart, 126 S. Ct. 1943, 1948 (2006)). Also, a mistake, if it is a reasonable mistake, can nevertheless support the exigent circumstances exception. Smith v. Kansas City, Missouri Police Dept., 586 F.3d 576, 581 (8th Cir. 2009).

Where an experienced officer objectively would believe that his entry is necessary to assist persons who are seriously injured or threatened with such

injury, exigent circumstances exist. Valencia, 499 F.3d at 815-16 (citing Brigham City v. Stuart, 126 S. Ct. 1943, 1947 (2006)). In Valencia, exigent circumstances existed where a firearm had been discharged from an apartment, even though the shooter had been apprehended, his girlfriend was no longer in the apartment, and 30 minutes had elapsed between the arrival of police on the scene and their kicking down the door of the apartment. Id. The police had not found the weapon and did not know if anyone else was in the apartment, including other potential victims or a potential shooter. Id.

In United States v. Janis, 387 F.3d 682 (8th Cir. 2004), the court found exigent circumstances existed justifying police entering a home without a warrant even though the victim had been taken to a hospital. Id. at 687-88. The court noted that the officers believed that a loaded firearm was still inside the home, and that there could have been other victims inside the home that were injured or in danger. Id. at 688. See also United States v. Arcobasso, 882 F.2d 1304, 1306 (8th Cir. 1989) (warrantless entry justified by exigent circumstances where officers knew "Rick" was inside home, and could reasonably believe that "Rick" was either in danger himself, or posed a danger to the officers' safety).

Fear for the safety of the police officers themselves can also justify a warrantless entry into a home based on exigent circumstances. See United States v. Vance, 53 F.3d 220, 222 (8th Cir. 1995); Arcobasso, 882 F.2d at

1306. Such a fear is reasonable where officers reasonably believe that individuals or weapons are still in a home. Vance, 53 F.3d at 222; Arcobasso, 882 F.2d at 1306.

The Eighth Circuit has affirmed the exigent circumstances exception to the warrant requirement even where a substantial amount of time has elapsed between the officers' arrival on the scene and the time the warrantless entry occurred. Valencia, 499 F.3d at 816-17 (upholding exigent circumstances exception where police entered apartment 33 minutes after first dispatch call reporting shots fired where police detained defendant, looked for evidence outside, and tried to pick the lock on the apartment to avoid a forcible entry before finally kicking the door down); United States v. Jones, 635 F.2d 1357, 1361-1362 (8th Cir. 1980) (upholding exigent circumstances exception where police took one hour to conduct "careful police work . . . [first seeking] to elicit a response from the suspect and then attempt[ing] to obtain a key in an effort to avoid forcible entry").

A case involving domestic violence is United States v. Henderson, 553 F.3d 1163 (8th Cir. 2009) (***per curiam***). In that case, a ten-year-old boy and the mother of the victim told police that Henderson was inside a bedroom with a gun and his wife. Id. at 1164. When officers knocked on the bedroom door, the light was shut off and conversation inside the room ceased. Id. The officers opened the door, entered the bedroom, and arrested and handcuffed

11

Henderson. Id. at 1165. After Henderson was already under arrest and handcuffed, the officers searched the room and found a handgun under the sheet on the bed near where Henderson and his wife had been standing. Id.

Because he was already under arrest and handcuffed at the time the officers conducted the search that turned up the gun, Henderson argued that exigent circumstances no longer justified the warrantless search and urged suppression of the evidence of the gun. Id. The Eighth Circuit disagreed, noting that "domestic disturbances are highly volatile and involve large risks" and that the officers reasonably believed a loaded gun was still in the room. Id. This, the court held, made it "plain" that exigent circumstances justified the search. Id.

Another case arising from domestic violence demonstrates that even a reasonable fear for the safety of the aggressor can justify a warrantless entry due to exigent circumstances. See United States v. Uscanga-Ramirez, 475 F.3d 1024 (8th Cir. 2007). In that case, the mother of the wife called police to report that her son-in-law was holding her daughter against her will in a house. Id. at 1026. Upon arrival on the scene, the daughter met the officers outside the house and said her husband had not held her against her will, but that he was upset because she was leaving him and had locked himself in a bedroom with a gun. Id. The Eighth Circuit held that the officers' warrantless entry into the

bedroom was justified by a reasonable fear that the husband would seriously injure or kill himself. Id. at 1028-29.

In a case decided last year, the Supreme Court considered whether officers create exigent circumstances illegally by knocking on a door in Kentucky v. King, ___ U.S. ___, 131 S. Ct. 1849 (2011). In King, officers were pursuing a drug suspect after a controlled buy of methamphetamine. Id. at ___, 131 S. Ct. at 1854. Approaching an apartment door into which the officers mistakenly believed the suspect had fled, they banged on the door as loud as they could and announced that they were the police. Id. They immediately heard people moving inside, leading the officers to believe that evidence of drug trafficking was about to be destroyed, whereupon the officers kicked in the door and entered. Id. The Court held that where the officers' conduct was objectively reasonable and not violative of the Fourth Amendment prior to entry into the home, exigent circumstances to prevent the destruction of evidence exist which justify a warrantless search. Id. at ___, 131 S. Ct. at 1858-62. Put another way, "the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." Id. at 1862.

Examining the facts, the Court held that merely knocking on a door without a warrant–even "banging" on the door loudly–does not violate the Fourth Amendment, so the officers' conduct in this case did not impermissibly

13

violate, or threaten to violate, the Fourth Amendment. Id. The occupants inside are not obligated to open the door or to speak. Id. The Court did not reach the question whether the evidence of noises inside the apartment were sufficient to create a reasonable, objective belief that evidence was about to be destroyed. Id.

Mr. LaDeaux argues in his supplemental brief that no one told Officer Ten Fingers when the second series of 911 calls were made to dispatch that an incident of domestic violence was in progress. That is a correct observation. Mr. LaDeaux is also correct that Officer Ten Fingers made an assumption or inference that he was investigating an incident of domestic violence. Where the court parts company with Mr. LaDeaux in his analysis is whether Officer Ten Fingers' inference was reasonable.

In this case, Officer Ten Fingers' belief that an incident of domestic violence was unfolding before his eyes was reasonable. There was a past history of such violence between Mr. LaDeaux and Amy Belt, both several months prior to the 3 a.m. phone calls on September 5th and just 30 minutes prior. The coordinates of the second series of 911 calls were consistent with an ongoing incident at the LaDeaux residence. The calls indicated a woman crying and a male whom she was trying to fend off. Furthermore, Amy Belt's demeanor as she fled the LaDeaux residence was consistent with being a victim

of domestic violence: she was fleeing in terror of someone or something and she was crying.

Officer Ten Fingers was justified in reacting quickly to this situation and attempting to prevent the person who slammed the door of the trailer from retrieving a firearm or other weapon. If Officer Ten Fingers had taken the time to chase after Amy, detain her, get her calmed down enough that she could communicate with him, and debrief her, he might have allowed the aggressor to obtain a firearm and begin taking shots at Amy, Officer Ten Fingers, or both. Such situations are highly volatile and Officer Ten Fingers had to make a split-second assessment of the situation and take action. This is exactly the type of situation contemplated by the exigent circumstances exception. Like the police in King, merely responding to the 911 calls and being present was not a violation or threatened violation of the Fourth Amendment, so Officer Ten Fingers did not create the exigent circumstances in which he found himself.

Mr. LaDeaux cites to Smith v. Kansas City, Missouri Police Dept., 586 F.3d 576 (8th Cir. 2009) in support of his motion, and to Singer v. Court of Common Pleas, 879 F.2d 1203 (3d Cir. 1989). In Smith, a civil action for damages was brought premised on police entering the home of the brother of an alleged batterer. Id. at 578-79. Key to the court's holding are the facts of the case and the procedural posture of the case. In Smith, a woman had been assaulted by her boyfriend and bore physical indicia of the assault. Id. at 579.

She called police after the assault was over and the boyfriend had fled the vicinity. Id. The woman told police that her boyfriend might be at his brother's house or that he might be at a second location. Id. Police went to the brother's home and a warrantless entry of the home ensued. Id.

The procedural posture was that the individual police officers moved for summary judgment on the brother's civil claims, asserting that they were entitled to qualified immunity. Id. at 578. The district court found that there were genuine issues of material fact preventing the granting of summary judgment in the officers' favor. Id.; see also Smith v. Kansas City, Missouri Police Dept., 2009 WL 330865 *5 (W.D. Mo. 2009) (stating that "the evidence of exigent circumstances is not sufficient to support summary judgment."). When the district court so ruled, and the Eighth Circuit affirmed, neither court was definitively holding that the officers had violated the brother's Fourth Amendment rights; but rather that the facts were such that a jury trial was required to resolve the brother's claims. Smith, 586 F.3d at 579-81; Smith, 2009 WL 330865 *5.

This court further finds the facts of the Smith case distinguishable. In Smith, both the district court and the Eighth Circuit relied for their analysis of the exigent circumstances on the facts relating to proximity and delay: (1) the victim and the batterer were separated by some significant distance at the time the officers arrived on the scene to take the woman's report; and (2) the assault

16

was long over with by the time the officers arrived. Smith, 586 F.3d at 579-81; Smith, 2009 WL 330865 *5.[1] Here, by contrast, the facts which Officer Ten Fingers faced were that the assault was in progress or had only just ended and the victim and batterer were still in the same vicinity with each other–if Mr. LaDeaux had retrieved a gun, Amy would still have been within shooting distance, as would Officer Ten Fingers. The fact that Officer Ten Fingers might have been mistaken about his belief that Mr. LaDeaux was retrieving a gun (when in fact he was retrieving a knife) is immaterial if his mistake was reasonable. Smith, 586 F.3d at 581. The court finds his mistake, if there was one, to be reasonable. The court concludes that Officer Ten Fingers did not violate James LaDeaux's Fourth Amendment rights by entering his home without a warrant.

## CONCLUSION

The court respectfully recommends that defendant James LaDeaux's motion to suppress [Docket No. 19] be denied in its entirety.

---

[1] The Singer case is from the Third Circuit and, thus, is not binding authority on this court. Nevertheless, the same facts regarding delay and proximity serve to distinguish the Singer case from the facts of this case. In Singer, the victims were geographically removed from the location of the batterer at the time the warrantless entry occurred and the assault had been over with for some 90 minutes before the officers barged into the batterer's home. See Singer v. Court of Common Pleas, 879 F.2d 1203, 1206-07 (3d Cir. 1989).

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1)(B).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely and specific in order to require ***de novo*** review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated March 16, 2012

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE